Gregory A. FRASER, Plaintiff,

v.

FIDUCIARY TRUST COMPANY INTERNATIONAL, Franklin Resources Inc., Michael Materasso, Jeremy H. Biggs, William Y. Yun, Charles B. Johnson, Anne M. Tatlock, Gregory E. Johnson and Martin L. Flanagan, Defendants.

No. 04 Civ. 6958(PAC).

United States District Court, S.D. New York.

Feb. 15, 2006.

Bruce A. Hubbard, Bruce A. Hubbard, P.C., New York City, for Plaintiff.

Christina L. Feege, Littler Mendelson, P.C., Littler Mendelson, P.C., New York City, for Defendants.

*DECISION AND ORDER*

CROTTY, District Judge.

Plaintiff Gregory A. Fraser ("Fraser") filed a Second Amended Complaint ("Compl.") on August 12, 2005 against Fiduciary Trust Company International ("Fiduciary"), Franklin Resources Inc. ("Franklin"), Michael Materasso ("Materasso"), Jeremy H. Biggs ("Biggs"), William Y. Yun ("Yun"), Charles B. Johnson, Anne M. Tatlock, Gregory E. Johnson, and Michael L. Flanagan (collectively, "Defendants").[1] Before the Court is Defendants' motion to dismiss numerous claims in the Second Amended Complaint ("Compl."). Fraser amended the Amended Complaint following Judge Berman's June 23, 2005 decision, which granted in part and denied in part Defendants' first motion to dismiss.[2]

In the June 23, 2005 Decision, Judge Berman denied Defendants' motion to dismiss with regard to the following claims: a whistleblower claim under § 806 of the Sarbanes–Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A (based on the Third Instance (out of four) alleged by Fraser); a discriminatory discharge claim under § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140; and, race discrimination claims asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–101 *et seq.*, arising out of Defendants' alleged discriminatory treatment of Fraser on the basis of his race.

Judge Berman dismissed without prejudice the following claims: securities law claims pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t, Rule 10b–5, 17 C.F.R. § 240–10b–5, and California Corporations Code § 25402; SOX § 806 whistleblower claims based on Fraser's alleged First, Second, and Fourth Instances and all SOX § 806 claims against Individual Defendants; an ERISA § 510 whistleblower claim; an ERISA § 404 breach of fiduciary duty claim; and a common law breach of contract claim. Judge Berman dismissed with prejudice claims brought under § 15 of the Exchange Act and §§ 1102 and 1107 of SOX.

Fraser's Second Amended Complaint deleted the claims Judge Berman dismissed with prejudice and repleaded the securities law, ERISA, SOX, and breach of contract claims. Despite Judge Berman's direction that the Second Amended Complaint be more "streamline[d] and better organize[d]" than the 110–page Amended Complaint (June 23, 2005 Decision, at 26) (and the command of Rule 8, calling for a "short and plain statement of the claim," Fed.R.Civ.P. 8,) the Second Amended Complaint is 91 pages long and suffers many of the infirmities of the prior complaint.

The prolix, wandering style of the allegations of the Second Amended Complaint do not cure the deficiencies that Judge Berman found with the securities claims, §§ 10(b) and 20(a), Rule 10b–5, and California Corporate Codes §§ 25402 and 25502; with the §§ 510 and 404 ERISA claims; and with § 806 SOX claims based on the First and Fourth Instances. The Court dismisses those claims with prejudice. The Second Amended Complaint cures the deficiencies with regard to the SOX § 806 whistleblower claim based on

---

1. The individual defendants are referred to as the "Individual Defendants."

2. This action was reassigned to this Court on August 5, 2005.

the Second Instance as well as the common law breach of contract claim.

## INTRODUCTION

Judge Berman's June 23, 2005 Decision and Order provided a detailed accounting of the factual background to this case (June 23, 2005 Decision and Order, at 2–6). The Court, thus, will not recount detailed facts, which specifically relate to the claims that Judge Berman sustained in Defendants' first motion to dismiss (*i.e.*, race discrimination claims, the § 510 ERISA discriminatory discharge claim, and the § 806 SOX whistleblower claim (Third Instance)).

## I. Facts

### A. The Parties

Plaintiff was a Vice President at Fiduciary Trust Company International ("Fiduciary"). Compl. ¶ 94. Fraser began employment with Fiduciary on October 2, 2000, *id.*, and was terminated on March 7, 2003. *Id.* ¶ 70.

Defendant Fiduciary is an investment management company and chartered bank under New York laws with its principal offices located in New York. *Id.* ¶ 15. Fiduciary was acquired by defendant Franklin Resources Inc. ("Franklin") on April 10, 2001 and is now a wholly-owned subsidiary of Franklin. *Id.* Franklin is a Delaware corporation with principal offices located in California. *Id.* ¶ 16. Franklin is a global investment management and advisory services company. *Id.*

Defendant Michael Materasso was Head of Domestic Fixed Income Asset Management at Fiduciary. *Id.* ¶ 17. Materasso was Fraser's direct supervisor starting in October, 2000. *Id.* On November, 2001, Materasso became Head of Domestic and Global Fixed Income. *Id.* Materasso received the claimed whistleblowing notices and complaints. *Id.* Materasso also engaged in claimed racially discriminatory conduct and fabricated retaliatory allegations to terminate Fraser. *Id.*

Defendant Jeremy H. Biggs is the current Vice Chairman of Fiduciary and former Chief Investment Officer. *Id.* ¶ 18. Defendant William Y. Yun ("Yun") is the current President of Fiduciary and of Franklin Templeton Institutional. *Id.* ¶ 19. Defendant Charles B. Johnson is the former Chief Executive Officer of Franklin and served in that capacity from 1957 until 2004. *Id.* ¶ 20. Johnson also serves as the Chairman of the Board of Directors of Franklin. *Id.* Defendant Anne M. Tatlock is the Chief Executive Officer and Chair of the Board of Directors of Fiduciary. *Id.* ¶ 21. Defendant Gregory E. Johnson is a Co–Chief Executive Officer and Co–President of Franklin and member of the Board of Fiduciary. *Id.* ¶ 22. Finally, Defendant Martin L. Flanagan was also Co–Chief Executive Officer and Co–President of Franklin. *Id.* ¶ 23. Flanagan left the company on July 31, 2005. *Id.*

### B. Claimed Corporate Wrongdoing

Fraser claims illegal conduct related to Franklin's acquisition of Fiduciary. *Id.* ¶ 33. Fraser claims that filings in connection with the acquisition contained "insufficient, not meaningful, materially false and misleading" statements. *Id.* Chief among these allegations is the improper inclusion of U.N. Pension Fund Account assets in Fiduciary's and Franklin's assets under management ("AUM") and improper low fees. *Id.* (cataloguing alleged wrongdoing). According to Fraser, this spawns a raft of further allegations of violations of GAAP standards, breach of Securities and Exchange Commission ("SEC") accounting and reporting requirements, and overvaluation of Fiduciary at the time of Franklin's acquisition. *Id.* ¶¶ 34–61.

## C. Claimed Whistleblowing Activities

Fraser alleges that he sent Materasso an e-mail on March 19, 2001, which put Materasso on notice that Fraser "suspect[ed] ... accounting misconduct at Fiduciary and stressed that he was obligated to comply with the [Chartered Financial Analyst ("CFA")] Institute's Code and Standards." *Id.* lines 1990–91.[3] After this e-mail, Fraser contends that Materasso "embarked on a campaign of retaliation, denial of promotion and advancement opportunities and adverse employment actions toward [him] culminating in [his] March 7, 2003 unlawful and retaliatory discharge at Materasso's direction." *Id.* lines 1992–95.

### 1. First Claimed Instance

Fraser sent e-mails to Fiduciary's Chief Investment Officer, Biggs, in December, 2001, which claimed that a portfolio manager named Michael Rohwetter ("Rohwetter") was responsible for poor performance across ERISA and trust accounts (managed by Fraser's Department, Institutional Fixed Income) because Rohwetter had not followed Fraser's investment strategy advice. *Id.* ¶ 67. Fraser also alleged that Rohwetter wanted Fraser to conceal and falsify 2001 year-end performance results. *Id.* After these e-mails, Fraser alleges that "Rohwetter commenced retaliatory actions against him with a pattern of negative behavior (i.e., reduced his responsibilities, less opportunities for career advancement, unnecessary criticism of Plaintiff's work, less recognition and exposure to senior management, less sociable and less friendly)." *Id.* According to Fraser, Rohwetter engaged in conduct that violated a whole host of provisions under ERISA, the In-

vestment Advisors Act of 1940 ("IAA"), the Uniform Prudent Investor Act of 1994, and the New York State Estates, Powers & Trusts Laws. *Id.*

### 2. Second Claimed Instance

In May, 2002, Plaintiff sent a notice to Fiduciary President Yun that the New York office's decision to sell WorldCom bonds from New York-based ERISA and trust management accounts was not equally disseminated to all accounts firm-wide. *Id.* ¶ 68. In February, 2002, Fraser wanted to communicate firm-wide that the Head Office had decided to sell its World-Com holdings. Rohwetter instructed him not to do so. *Id.* As a result, Fraser claims that the Los Angeles office continued to hold WorldCom bonds "because they were unaware that [the New York office] was exiting its WorldCom positions." *Id.* This decision, Fraser states, resulted eventually in "substantial losses in [Los Angeles]-ERISA and trust accounts holding WorldCom bonds." *Id.* Fraser characterized this conduct as a breach of fiduciary conduct and evidence of a conflict of interest. *Id.* Fraser states that after his report to Yun, Materasso and Rohwetter "commenced retaliatory actions against him"—again with a pattern of negative behavior culminating in "less sociable" and "less friendly". *Id.* The conduct related to the WorldCom bonds, Fraser charges, constituted "clear violations" of a host of federal laws, including ERISA and the IAA, and was a fraud on investors. *Id.*

Fraser claims that in the Fall of 2002, "an anonymous e-mail was sent ... to Franklin senior management, Franklin's legal department and the SEC informing them that an accounting fraud involving improperly classified U.N. Pension Fund

---

**3.** The Second Amended Complaint contains both paragraphs and line numbers. Where the cited material is easily identified by para-

graph, the Court so notes; when necessary, the Court cites to line numbers.

Accounts was taking place at Fiduciary." *Id.* ¶ 69.

### 3. Third Claimed Instance

Fraser claims that approximately one to two weeks before his wrongful termination on March 7, 2003, he became aware of a scheme on the part of Fiduciary senior officers to manipulate and falsify managed assets and defraud clients. *Id.* ¶ 70. This scheme was related to the reported AUM and the fact that Fiduciary only received a nominal consulting fee in connection with its activities with the U.N. Pension Fund. *Id.* Fraser confronted Materasso about his allegations and Materasso simply "brushed [him] off." *Id.* Judge Berman previously allowed this instance as a basis for Fraser's SOX § 806 claim (June 23, 2005 Decision and Order, at 26).

### 4. Fourth Claimed Instance

On March 6, 2003, one day prior to his discharge, Fraser sent an e-mail to Materasso, Yun and others "to inform senior management that investment performance had suffered because the New York office failed to implement a recommendation he proposed on November 1, 2002 to establish a long/short high-yield investment fund for Fiduciary clients." *Id.* ¶ 71. Fraser states that later that day, Fiduciary retaliated against him "with a discriminatory act by falsely charging him of violating company policy and asking him to submit his resignation or accept a discharge from the company." *Id.*

## II. Legal Standard

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On a motion to dismiss

based on Rule 12(b)(6), "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991) (citations omitted). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims'." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted).

■ When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the Complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993). Because Fraser refers to multiple documents crucial to his claims, these documents may properly be considered for the purposes of this motion. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

## III. Analysis

### A. Securities Claims

#### 1. § 10(b) and Rule 10b–5 Claims

Fraser asserts claims under § 10(b) of the Securities and Exchange Act ("SEA"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10(b), in the First Cause of Action of the Second Amended Complaint. The critical issue here is whether any of Fraser's allegations demonstrate that claimed misconduct occurred.

##### a. No "In Connection with a Purchase or Sale" Shown

■ Under the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores,* only an actual purchaser or seller of securities has standing to assert claims under § 10(b) and Rule 10b–5. 421 U.S. 723, 749–55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Fraser pleads a number of facts

relating to his status as purported purchaser and seller of Franklin securities. Compl. lines 1630–90. The plain fact is that Fraser never purchased the Franklin securities. *Id.* lines 1630–31. He earned them as a part of his compensation and thus was not a purchaser. As to the other shares he acquired, they also suffer from fatal infirmities.

■ This Court adopts the analysis set out in Judge Berman's decision with regard to the grant of Franklin stock to Fraser through the Company's Restricted Stock Award Program *en toto* (*see,* June 23, 2005 Decision and Order, 7–10 (citing *In re Cendant Corp. Sec. Litig.,* 81 F.Supp.2d 550, 556 (D.N.J.2000) ("When an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for ... stock, there is no 'purchase or sale' of securities." (citation omitted)))), and finds that Fraser does not satisfy the purchaser / seller requirement with regard to these shares.

With regard to the securities, which Fraser alleges he acquired under Incentive Plans by being induced to stay following the offer of employment from a competitor, Compl. lines 1643–90, this allegation is plagued by a number of fatal pleading deficiencies. First, Fraser fails to allege the number of Franklin stock that he acquired as part these Incentive Plans. *Id.* Second, while Fraser denominates these shares as ones acquired under the Incen-

tive Plans (which are identified as the Fiduciary / Franklin Cash and Bonus Compensation Retention Plan and the Franklin Universal Stock Incentive Plan in the Second Amended Complaint, Compl. lines 1970–72), these shares were not identified as such in the "schedule" of stock purchased (Pl.'s Ex. E). Instead, the "schedule" includes information regarding the "acquisition" of Trio Plan Stock Fund, Bond Fund, and Special Equity Fund and specifies as the acquisition date "[January 1, 2002 to March 31, 2002]." *Id.* Further, Fraser fails to identify any number of shares "acquired" through any of the Incentive Plans in both the schedule and the Second Amended Complaint. As Judge Berman noted, in order to satisfy the pleading requirement of Rule 9(b), Fraser must allege the dates on which he acquired stock and the number of shares acquired (June 23, 2005 Decision and Order, at 8 (citing cases)). Because the Second Amended Complaint fails to cure these (and other) defects related to the retention plans, the securities claims can not stand.[4]

### b. § 10(b) Claim is Untimely

■ "Section 10(b) of the Securities Exchange Act of 1934 provides that '[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such viola-

---

4. Further, the Court doubts whether the second set of shares, in fact, even constitute bargained-for consideration as Fraser contends. Fraser relies on a company memorandum dated October 25, 2000 to show that Fraser was induced to stay at Franklin and forewent alternate, more lucrative compensation in exchange for the shares he received under the Incentive Plans (Pl.Ex. L). However, as Defendants point out, the memorandum in fact states that the company "ha[d] arranged for retention bonuses to be paid to all active salaried employees who have *accepted positions with us* through October 25, 2000." *Id.* (emphasis added). Elsewhere, Fraser alleges that he first received an offer of employment from Fiduciary in September, 2000, Compl. lines 1643, and that he started work at Fiduciary in October 2000. *Id.* lines 1646–47; *see also id.* lines 1997–99 (stating that Materasso included Fraser in the October 2000 Retention Plan although Fraser had been with the company for less than a month).

tion.'" *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 167 (2d Cir.2005) (citing 15 U.S.C. § 78*i* (e)) (internal quotation marks and other citations omitted); *see also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003). Fraser's Second Amended Complaint tries to avoid the statute of limitations by walking a fine line between what he "suspected" and what he "knew". Fraser attempts to avoid the statute of limitations by claiming that he based the March 19, 2001 actions on "suspicions" and that he did not have direct knowledge or evidence of wrongdoing until "one or two weeks" prior to his termination on March 7, 2003. *Id.* lines 793–97. Fraser can't have it both ways—he cannot plead for purposes of his whistleblower claims that he "suspected"—*i.e.*, discovered—wrongdoing in connection with the U.N. Pension Fund on March 19, 2001 but plead for purposes of his securities claims that he "knew"—*i.e.*, discovered—that wrongdoing in early March, 2003. *Compare* Compl. lines 2002–03 ("After Plaintiff's March 19, 2001 e-mail, Materasso was motivated to deny Plaintiff promotion and portfolio management opportunities."), *with id.* lines 1994–96 ("Plaintiff's March 19, 2001 e-mail put Materasso on notice that [P]laintiff was aware of unlawful activity at Fiduciary although at that time Plaintiff had no direct evidence to support his suspicions.").

Where an employee asserts securities fraud claims against an employer, the "discovery" analysis for purposes of the statute of limitations differs somewhat from the typical investor case. The Second Circuit has stated that "where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint,' we can readily resolve the issue on a motion to dismiss, and have done so in 'a vast num-

ber of cases'." *Lentell*, 396 F.3d at 168 (citation omitted).

Fraser pled facts in which he claimed to have conducted an investigation relating to his "suspicions" about Defendants' improper AUM—*i.e.*, that he had conversations with several Fiduciary employees about the subject, that he reviewed Fiduciary's public financial reports, that he reviewed Fiduciary client presentation material, and, that he noted the fact that Fiduciary had a far smaller number of fixed income employees dedicated to managing its purported $20 billion in fixed income assets compared to other firms that disclosed a similar level of fixed income. Compl. lines 659–66, 670–76. This investigation and the knowledge he gained through it caused Fraser to communicate with higher-ups— albeit in general terms—regarding his suspicions. *See id.* lines 1994–96 ("Essentially, Plaintiff's March 19, 2001 e-mail put Materasso on notice that [P]laintiff was aware of unlawful activity at Fiduciary although at that time Plaintiff had no direct evidence to support his suspicions."). Having plead that he engaged in an investigation sufficient to raise "suspicions," which induced Fraser to act, Fraser has asserted on the face of the complaint that he had discovered the claimed wrongdoing as early as March, 2001 and, thus, is time-barred from asserting the § 10(b) claim. Accordingly, an alternate ground for dismissal of the § 10(b) claim is that it is time-barred.

**2. California Securities Claims**

■ Fraser asserts securities claims under California Corporate Code §§ 25402 and 25502. Section 25506 of the California Corporate Code provides that "[f]or proceedings commencing before January 1, 2005, no action shall be maintained to enforce any liability created under Section ... 25502 .... unless brought before the

expiration of four years after the act or transaction constituting the violation or the expiration of one year after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp.Code § 25506. Section 25502 provides for damages for violations of § 25402. Cal. Corp.Code § 25502. Thus, Fraser's California securities claims are time-barred for the reasons stated above in relation to the federal securities claims (*i.e.*, Fraser pled facts showing discovery of the circumstances giving rise to the AUM-related fraud in March, 2001).[5]

### 3. Controlling Person Liability

Because the Court is dismissing Fraser's § 10(b) and Rule 10b–5 claim, the Court also dismisses Fraser's Second Cause of Action for controlling person liability under § 20(a) of the Exchange Act. 15 U.S.C. § 78t; *see also* June 23, 2005 Decision and Order, at 10 (citing *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 235 (S.D.N.Y.1997)).

### B. ERISA Claims

In Fraser's Amended Complaint he asserted three claims under ERISA: a § 510 claim for discriminatory discharge; a § 510 whistleblower claim; and a § 404 breach of fiduciary duty claim. Judge Berman sustained the § 510 discriminatory discharge claim (June 23, 2005 Decision and Order, at 26) and dismissed the other two claims without prejudice. The Court next considers Defendants' motion to dismiss each of the two remaining ERISA claims.

### 1. ERISA § 510 Whistleblower Claim

■ In the Second Amended Complaint (Third Cause of Action), Fraser asserts a

claim under § 510 of ERISA. Compl. line 1794. ERISA § 510 provides that "[i]t shall be unlawful for any person to discharge ... or discriminate against any person because he has given information or has testified or is about to testify in any *inquiry or proceeding* relating to this chapter...." 29 U.S.C. § 1140 (emphasis added). As Judge Berman noted in his Decision and Order, in order for a plaintiff to assert a claim under this provision, he must allege "that he gave information in connection with an 'inquiry'" (June 23, 2005 Decision and Order, at 19) (citing *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 328–29 (2d Cir.2005)). The Second Amended Complaint did not cure Fraser's prior failure to plead facts that he provided information concerning ERISA violations in response to an "inquiry." Thus, this claim is dismissed with prejudice.

### 2. ERISA § 404 Breach of Fiduciary Duty Claims

In the Second Amended Complaint (Third Cause of Action), Fraser also asserts a claim under § 404 of ERISA against the Individual Defendants. Compl. lines 1788–92, 1877–80. This provision imposes a "prudent man standard of care" on fiduciaries under the Act. 29 U.S.C. § 1104(a). More specifically, this duty requires ERISA fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," § 1104(a)(1), "for the exclusive purpose of providing benefits to participants and their beneficiaries," § 1104(a)(1)(A)(I), and "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." § 1104(a)(1)(C). ERISA defines a

---

**5.** Plaintiff's counsel conceded at Oral Argument that if the Court were to dismiss the federal securities claims, the California securities violations would also have to be dismissed.

person to be "a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." § 1002(21)(A).

Defendants contend that this claim should be dismissed because "the Second Amended Complaint lacks sufficient allegations to establish that any of the Individual Defendants are fiduciaries" (Defs.' Br. 13).

In the Second Amended Complaint, Fraser's allegations regarding the Individual Defendants identifies their role in the defendant companies (*see* Compl. lines 188–212). None of these allegations, however, contain facts regarding the Individual Defendants and their role as fiduciaries vis-a-vis the "Trio Plan," which is the basis of this ERISA claim. *Id.* The allegations with respect to the Individual Defendants and the ERISA § 404 breach of fiduciary claim is limited to the following:

- "[t]he Individual Defendants owed and owe Fiduciary, Franklin and their respective Client Participants and Beneficiaries fiduciary obligations and duties," Compl. lines 1788–89;
- "[t]he Individual Defendants, and each of them, respectively, violated their respective fiduciary obligations and breached their fiduciary duties as set forth in Sections 510 and 1104, respectively of [ERISA][;][t]hey made no reasonable inquiry[;][t]hey exercised no standard of due care; and they provided no oversight, supervision nor response to notices of wrongdoing." *Id.* lines 1793–97.

"Given that a defendant's role as an executive of an employing company is, standing alone, insufficient to confer fiduciary status, these allegations are inadequate." *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 02 Civ. 8853, 2005 WL 563166, at *4, 2005 U.S. Dist. LEXIS 3715, at *14 (S.D.N.Y. Mar. 10, 2005) (citing to regulations). The pleading requirements for an ERISA claim are not stringent: "an ERISA complaint need 'do little more than track the statutory definition' to establish a defendant's fiduciary status in compliance with Rule 8." *In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 470 (S.D.N.Y.2005) (citations omitted). A complaint "satisfies that standard by separately alleging that each Defendant was a Plan fiduciary who exercised discretionary authority regarding the Plan." *Id.* Because Fraser has failed to satisfy even this very liberal requirement, the ERISA § 404 breach of fiduciary claim is dismissed with prejudice.

## C. SOX Claims

Fraser asserts SOX § 806 claims based on four purported instances of whistleblowing. As noted previously, Judge Berman sustained one claim based on the Third Instance and dismissed without prejudice other claims based on the First, Second, and Fourth Instances alleged in the Amended Complaint (June 23, 2005 Decision and Order, at 26).

Section 806 provides that "[n]o company with a class of securities registered under section 12 of the [Exchange Act], or that is required to file reports under section 15(d) of the [Exchange Act], or any officer, employee, contractor, subcontractor, or agent of such company, may discharge ... or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide informa-

tion ... regarding any conduct which the employee reasonably believes constitutes a violation of ... any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information ... is provided to ... a person with supervisory authority over the employee." 18 U.S.C. § 1514A.

■ To assert a whistleblower claim under SOX, Fraser "must show by a preponderance of the evidence that (1)[he] engaged in protected activity; (2) the employer knew of the protected activity; (3)[he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004) (citations omitted). SOX protects employees who provide information, which the employee " 'reasonably believes constitutes a violation' " of any SEC rule or regulation or " 'Federal law relating to fraud against shareholders'." *Id.* (citing 18 U.S.C. § 1514A(a)(1)). While a plaintiff need not show an actual violation of law, *id,* or cite a code section he believes was violated (June 23, 2005 Decision and Order, at 16), " 'general inquiries ... do not constitute protected activity'." *Id.* (citing cases); *see also Lerbs v. Buca Di Beppo, Inc.*, 2004–SOX–8, 2004 DOLSOX LEXIS 65, at *33–34 (Dep't Labor June 15, 2004) ("[I]n order for the whistleblower to be protected by [SOX], the reported information must have a certain degree of specificity [and] must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal.") (citation omitted). Thus, "[p]rotected activity must implicate the substantive law protected in Sarbanes–Oxley 'definitively and specifically' " (June 23, 2005 Decision and Order, at 16 (citation omitted)).

### 1. First and Fourth Instances

■ Neither the First Instance nor the Fourth Instance constitute protected activity under SOX. With regard to the First Instance, Fraser contends that a confidential memo he prepared and sent to Fiduciary's Human Resources Department along with other e-mails to company official Biggs, the current Vice Chairman of Fiduciary and former Chief Investment Officer, contained whistleblowing information regarding illegal conduct. Compl. ¶ 67. Fraser alleges that the e-mails to Biggs "suggested the large losses sustained across accounts could have been avoided if Rohwetter had heeded [Fraser's] advice for investment strategy and not taken a cavalier attitude towards [Fraser's] credit research." *Id.* (lines 697–99) Further, the confidential memo "spoke of how Rohwetter wanted [Fraser] to conceal and falsify the actual 2001 year end performance results and characteristics for the high yield component of client portfolios in communication reports to clients." *Id.* (lines 707–10).

The Court has conducted a searching review of Fraser's original OSHA complaint and of the confidential memo (Pl.'s Ex. M). Fraser has failed to cure the pleading deficiency with regard to the First Instance, which Judge Berman previously found (June 23, 2005 Decision and Order, at 17). Fraser's documents complain that his advice was not followed, but they are barren of any allegations of conduct that would alert Defendants that Fraser believed the company was violating any federal rule or law related to fraud on shareholders. As such, any claim based on the First Instance is dismissed with prejudice.

With regard to the Fourth Instance, Fraser alleges that on March 6, 2003, one day before his termination, he sent an e-

mail to Materasso, Fiduciary President Yun, and General Counsel Edward Eisert "to inform senior management that investment performance had suffered because the New York office failed to implement a recommendation he proposed on November 1, 2002 to establish a long/short high-yield investment fund for Fiduciary clients." Compl. ¶ 71 (lines 837–42). Fraser further alleges that "[t]he high-yield sector was experiencing strong market appreciation shortly after his November 1st proposal and Fiduciary clients were missing out." *Id.* (lines 842–43). Fraser contends that "[t]he far too conservative investment posture" violated the clients' investment policy statement guidelines and the Third Restatement of Trusts. *Id.* (lines 857–58). The Fourth Instance suffers from the same deficiency as the First Instance. Fraser's March 6, 2003 e-mail is more a complaint that his advice was not being followed but contains no communication from Fraser to any of the Defendants indicating that Fraser believed the company to be violating any provision related to fraud on shareholders. Accordingly, the claim based on the Fourth Instance is dismissed with prejudice.[6]

## 2. Second Instance

██ Fraser's claim based on the Second Instance—although a close call—fares better. As noted previously, this communication concerned WorldCom bonds. On February 6, 2002, Fraser prepared an e-mail stating that the company's Fixed Income Group was "recommending a SELL on WorldCom bonds due to deteriorating industry conditions, continued pricing pressures and heightened competition" (Pl.'s Ex. M). The e-mail continued that "[a]lthough the debt is rated A3/Stable

/BBB+/Stable, its credit ratios continue to worsen on a sequential quarterly basis." *Id.* The e-mail attached another e-mail prepared on December 21, 2001, which contained an analysis and recommendation to reduce holdings of WorldCom bonds among other investments. *Id.* On May 16, 2002, Fraser forwarded to company President Yun the February 6, 2002 and December 21, 2001 e-mails stating "I prepared this e-mail to distribute firmwide, but was told by one of the NY-based PMs not send [sic] this e-mail out (for whatever reason, I do not know)." *Id.*

While Fraser does not expressly state in this e-mail that Defendants are engaged in illegal conduct related to fraud on shareholders, given the context of the e-mail and the circumstances giving rise to the communication—*i.e.*, clients of the New York office benefited from a prudent decision to timely sell WorldCom bonds, whereas the Los Angeles clients suffered losses related to this holdings, which losses they might have avoided had the New York office communicated the decision to sell—the e-mail is sufficient to satisfy the pleading requirement for a SOX whistle-blowing claim.

With regard to this claimed Instance, "[t]he Court finds that Defendants cannot establish as a matter of law that Plaintiff did not engage in protected activity under Sarbanes–Oxley." *Collins,* 334 F.Supp.2d at 1377. Thus,

> [t]hough this is a close case, ... the Court finds that there is a genuine issue of material fact whether Plaintiff engaged in protected activity. It is evidence that Plaintiff's complaints do not rise to the level of complaints that were raised by Sherron Watkins at Enron. However, the mere fact that the severity

---

**6.** Because there is no way to construe the First or Fourth Instances as protected activi-

ty, the Court does not reach the issue of whether ERISA violations fall under SOX.

or specificity of her complaints does not rise to the level of action that would spur Congress to draft legislation does not mean that the legislation it did draft was not meant to protect [him]. In short, if Congress had intended to limit the protection of Sarbanes Oxley ... or to have required complainants to specifically identify the code section that they believe was being violated, it could have done so. It did not. Congress instead protected "employees" and adopted the "reasonable belief" standard for those who "blow the whistle on fraud and protect investors."

*Id.* at 1377 (citations omitted).[7]

Judge Berman's June 23, 2005 Decision and Order previously found that Fraser satisfied the other prongs necessary to assert SOX whistleblower claims—that is, employer awareness of protected activity; unfavorable personnel action; and contributing factor (June 23, 2005 Decision and Order, at 17–18).[8]

### D. Race Discrimination Claims

Judge Berman denied Defendants' motion to dismiss Fraser's race discrimination claims. Accordingly, these claims survived and remain in the action.

### E. Breach of Contract Claim

 Generally the law in New York is that at-will employees, like Fraser, can be fired at any time, without reason. *Horn v. New York Times,* 100 N.Y.2d 85,

90–91, 760 N.Y.S.2d 378, 790 N.E.2d 753 (2003). There are certain well-defined and limited exceptions to this rule. *Id.* at 92, 760 N.Y.S.2d 378, 790 N.E.2d 753. Where an employer has a well-established, written practice that specifies procedures and grounds for termination, the "at-will" doctrine may be modified. *Weiner v. McGraw–Hill,* 57 N.Y.2d 458, 465–66, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982). "To establish that such policies are a part of the employment contract, an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." *Baron v. Port Auth. of N.Y. and N.J.,* 271 F.3d 81, 85 (2d Cir.2001) (citation omitted).

 Fraser satisfied the pleading requirement with regard to "express limitations." *Id.* Fraser cites passages from the manual, which states as follows: "[e]mployees are responsible for reporting to a Department Head if they have any knowledge of any illegal conduct by any employee, if that conduct relates to Company business ... [;][n]o reprisals shall be made against the reporting employee." Compl. ¶ 157 (lines 2143–49). In addition, the manual states that "an employee who has disclosed in good faith [those personal circumstances that the Policy Manual ad-

---

7. For purposes of SOX applicability, at a minimum, Fraser contends that the Second Instance relates to violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80–b *et seq.,* which prohibits fraudulent conduct by investment advisers against shareholders. Compl. lines 757–58, 761–62; *see also* 15 U.S.C. § 80–b(6)(2) (Investment Advisers Act of 1940, proscribing conduct "which operates as a fraud or deceit upon any client or prospective client").

8. Judge Berman suggested that the fact that the Second Instance occurred almost ten months prior to Fraser's termination did not provide sufficient temporal proximity to satisfy the "contributing factor" prong (June 23, 2005 Decision and Order, at 18). Nevertheless, the Court finds that Plaintiff has plead sufficient facts suggesting retaliation, such as for instance Materasso's moving Fraser's desk next to him. Compl. lines 762–63.

dresses [are] grounds for immediate dismissal and possible legal action] will be afforded a reasonable time to resolve conflicts or the appearance of conflict without prejudice." *Id.* ¶ 161 (lines 2192–99). "[D]efendants' ... Manual advises employees to report misconduct and assures protection from any retaliation[;][u]nder New York law, such language appears sufficient to create a limitation on the at-will nature of [Plaintiff's] employment." *Brady v. Calyon Securities (USA),* 406 F.Supp.2d 307, 316 (S.D.N.Y.2005). Fraser also satisfies the second prong of the pleading requirement—*i.e.* employer notification of employee—as he contends that he signed statements indicating his receipt of the Fiduciary Company Policy Manual in 2000, 2001, 2002, and 2003. Compl. ¶ 156 (lines 2129–30).

Judge Berman dismissed the breach of contract claim in his June 23, 2005 Decision and Order, in part, because Fraser failed to plead reliance. Fraser's Second Amended Complaint alleges reliance and thus cures the prior pleading deficiency. *See id.* ¶¶ 156, 157, 162. The Court denies Defendants' motion to dismiss the breach of contract claim.

### F. Jury Trial

█ "[T]here is no right to a jury trial under ERISA...." *Muller v. First Unum Life Ins. Co.,* 341 F.3d 119, 124 (2d Cir.2003) (citing *Sullivan v. LTV Aerospace and Def. Co.,* 82 F.3d 1251, 1257–59 (2d Cir.1996)). Accordingly, Defendants' motion to strike Plaintiff's Demand for Jury Trial on the ERISA claims is granted.

█ "[T]he SOX Act is silent as to whether a plaintiff may demand a jury trial...." *Hanna v. WCI Communities, Inc.,* 348 F.Supp.2d 1332, 1334 (S.D.Fla. 2004). This Court could find only one published decision, which considered whether a litigant may demand a jury trial for SOX claims. *Murray v. TXU Corp.,* 03 Civ. 0888, 2005 U.S. Dist. LEXIS 10945 (N.D. Tex. June 7, 2005). In that case, the court struck plaintiff's demand for a jury trial. *Id.* at *16.

At this time, the Court denies Defendants' motion to strike a jury trial on the SOX claims without prejudice to bring this motion again prior to trial. At that later juncture, the Court might have the benefit of guidance from additional courts that have considered the issue. *Hanna,* 348 F.Supp.2d at 1334.

### CONCLUSION

Judge Berman previously allowed the following claims: SOX § 806 based on the Third Instances; the discriminatory discharge § 510 ERISA claim; and all race discrimination complaints (June 23, 2005 Decision, at 26). Pursuant to this Order and Decision, the following claims are added: SOX § 806 claim based on the Second Instances and the common law breach of contract claim. In considering the contract claim, Fraser may assert the allegations arising out of the Second and Third Instances. The First and Fourth Instances do not rise to the level of whistleblowing and are more reflective of Fraser's complaints that Defendants did not follow his investment advice. They cannot be read as allegations of wrong-doing, the *sine qua non* of whistleblowing. Defendants should answer the surviving claims and discovery should proceed on the surviving claims.

Accordingly, the Court grants in part and denies in part Defendants' motion to dismiss.

SO ORDERED.